93 N.J. Super. 484 (1967)
226 A.2d 439
HOBOKEN CAMERA CENTER, INC., PHOTOPOOL, INC., CONSOLIDATED DISTRIBUTING CORP., SHOPPERS WORLD CAMERA CENTER, INC., MULTIPOOL, INC., AND KAYE CAMERA EXCHANGE, INC., PLAINTIFFS-APPELLANTS,
v.
HARTFORD ACCIDENT AND INDEMNITY COMPANY, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued October 31, 1966.
Decided January 23, 1967.
*486 Before Judges CONFORD, FOLEY and LEONARD.
Mr. Edward K. Zuckerman argued the cause for appellants.
Mr. Murray Greiman argued the cause for respondent (Messrs. Lifland & Greiman, attorneys).
The opinion of the court was delivered by CONFORD, S.J.A.D.
This is an action on a blanket position bond (employee fidelity insurance) covering three camera stores formerly operated by plaintiffs in Duluth, St. Paul and Minneapolis, all in Minnesota. Plaintiffs sued to recover losses aggregating $42,705.22, broken down to $13,752.20 at Duluth, $13,079.16 at St. Paul, and $15,873.86 at Minneapolis. All losses are alleged to have been sustained between July and September of 1962. The trial court granted judgment for defendant on a motion for judgment based upon a factual "Stipulation" entered into by the parties.
Plaintiffs rely for proof of the amounts of the losses stated upon inventory control records kept upon the "perpetual inventory" basis. Information concerning specific incidence of employee dishonesty is found in the record in two sources: (a) the stipulation aforesaid and (b) an affidavit and certain depositions and answers to interrogatories which were before the court on a previous motion by the defendant for summary judgment which was denied.
*487 The insuring agreement is of a standard type, running for one year from October 31, 1961. It covers "any loss of money or other property which the insured shall sustain through any fraudulent or dishonest act or acts committed by any of the Employees, acting alone or in collusion with others," with a limitation of $10,000 on each employee, and subject to a "Deductible Amount" of $250 for each loss by acts or defaults of any employee.
The agreement contains in section 2 of the "Conditions and Limitations" an "Exclusion," reading as follows:
"SECTION 2. This Bond does not apply to loss, or to that part of any loss, as the case may be, the proof of which, either as to its factual existence or as to its amount, is dependent upon an inventory computation or a profit and loss computation; provided, however, that this paragraph shall not apply to loss of money or other property which the Insured can prove, through evidence wholly apart from such computations, is sustained by the Insured through any fraudulent or dishonest act or acts committed by any one or more of the Employees."
The stipulation afore-mentioned reads, in material part, as follows:
"The plaintiff stipulates that it would offer in evidence, on the subject of damages, the following:
1. Testimony by one Sanford Hoffman, assistant store manager, that on or about October 4, 1962, he gave to Jerry Brown, plaintiff's employee, the sum of $99.96 petty cash from the cash register of the camera department in Shoppers' City, Duluth, Minnesota. He further gave to the said Jerry Brown, the sum of $6.52 representing a portion of the day's receipts, instructing Jerry Brown to deposit both sums to plaintiff's bank account. The said Jerry Brown only deposited the sum of $6.52 and failed to deposit or otherwise account for the sum of $99.96.
2. Testimony by Sanford Hoffman that on a relevant date close to closing time, he observed 2 cameras locked in a glass case. On the following morning he observed that both cameras were missing. No record of the sale of these cameras was present or in fact ever reported. Inquiry by him of every employee present on the previous evening was made, but each employee denied knowledge as to the whereabouts of the cameras.
3. Testimony of Dorothy Nelson that on a relevant date, Michael Stuppy, plaintiff's employee, stated that he had removed the sum of *488 $70.00 from the cash register to be used to pay the wages of employee William Jackson. Dorothy Nelson will further testify that at the time the statement was made, salary payments were made by check from the plaintiff's Hoboken office and that no payments of salary were ever made in cash.
4. Introduction into evidence of inventory control books, shipping records, inventory receipts, sales receipts, bills of sale and purchase receipts together with other documents relative to the keeping of inventory records.
5. Testimony by Margaret Theisen, plaintiff's bookkeeper in its Hoboken office, validating inventory control system as established by the aforesaid books and records. Testimony by the said Margaret Theisen that an analysis of the inventory control records revealed losses of a value of $42,705.22.
The plaintiff further stipulates that except as set forth above, no evidence will be introduced establishing the amount of the plaintiff's loss.
It is stipulated that the amount of the losses sustained under paragraphs 1, 2 and 3 hereinabove would not exceed $250.00 as to any single loss." (Emphasis added)

I
It was not entirely clear to us whether this stipulation was intended as plaintiff's exclusive probative reliance for the fact of loss and of employee dishonesty as the cause thereof, as well as for the amount of any such losses. Upon inquiry by the court after argument we were informed by plaintiff that the intent was solely as to amount of loss, the purpose being to elicit a ruling by the court as to whether the exclusionary clause would necessarily bar the action if plaintiff had no proof of the amount of the loss beyond the sums mentioned in the proffer of proof in the stipulation. If, on the other hand, the ruling favored plaintiff it would go to trial and adduce additional proofs, including expert accounting opinion, in support of the thesis that the inventory shortages were the product of employee dishonesty rather than any possible alternatives such as accounting error, larceny by outsiders, shoplifting or the like.
Although defendant disputes plaintiff's construction of the stipulation, we resolve this disagreement in plaintiff's favor for these reasons. The language of the stipulation favors *489 plaintiff's position. The trial court apparently determined the matter as one of law rather than fact, having previously denied a motion for summary judgment by defendant for the reason that material issues of fact were presented, and resting its conclusion on the later motion on the operation of the exclusionary clause of the bond as rendering inventory proofs immaterial. We note, in this regard, that an affidavit by Sanford Hoffman (see stipulation, supra, pars. 1 and 2) submitted on the motion for summary judgment contains more persuasive data as to the alleged criminal involvement of the employee Michael Stuppy in the shortages than does the stipulation.
Finally, the stipulation leaves much to be desired as an exclusive basis for determination of the factual sufficiency of plaintiff's proofs on the issue of employee-connection with the alleged shortages. It identifies the specific location (in relation to the three stores) of only the first incident mentioned. It gives the date of only one incident. It fails to indicate which employees were employed at each of the three stores involved, or how the $42,705.22 alleged gross losses are allocated to particular employees (having in mind the $10,000 policy limitation as to each).[1] It fails to specify the exact time periods covered by the inventory records relied on. This is important, not alone for obvious reasons but also in the light of the documents offered on the motion for summary judgment which indicate that at or about the period in question plaintiffs were dispossessed by the landlord of the leased *490 premises and brought suit against it in Minnesota charging conversion of the same inventory items here claimed to have been lost because of employee dishonesty.
In short, a plenary trial is required to fairly determine whether plaintiff sustained losses, their nature and amount, and to what extent they were due to employee infidelity. At such trial the stipulation afore-mentioned will no longer apply.

II
We thus arrive at the difficult problem of construction of the exclusion clause of the bond and its application to the case here presented. The trial court read the clause literally and decided that since proffered proofs of specific depredations by employees were of less than the deductible amount of $250 in each case, and since establishment of any larger loss was entirely dependent upon inventory records, the prohibition of resort thereto by the exclusion clause foreclosed the maintenance of plaintiff's cause of action.
It will be useful to preface the discussion with a brief survey of the antecedents of the exclusion clause here before us. The administration by insurance companies of claims on employee fidelity bonds has long presented difficulties where the insured could point to little or no direct or circumstantial evidence of specific losses or shortages, or of employee dishonesty, but had indications of abnormal inventory shortages as reflected by normal inventory accounting records. See Bunge, "Inventory Shortages," Insurance Counsel Journal, October 1953, p. 271; Kurland, "Claims for Inventory Shortage," etc., Insurance Counsel Journal, July 1966, p. 397. The problem was only slightly less troublesome where the insured could show only one or a few specific employee-connected losses of small consequence in comparison with substantial inventory shortages revealed by the accounting records of the firm which the insured regarded as reasonably demonstrative of the total depredations of the employee in question. The concern of the insurers had a two-fold foundation: (a) the *491 uncertain reliability of some inventory accounting procedures as reflective of true shortages at all[2]; (b) the supposed speculative relationship between proved shortages and employee infidelity in view of other potential explanations like larceny by outsiders, shoplifting, etc.
As noted by the court in Mid-Continent Stores v. Central Surety & Ins. Corp., 377 S.W.2d 567, 568 (Kans. City (Mo.) Ct. App. 1964), involving the same exclusion clause as here,
"Defendant's brief discloses that experts in the field of inventory and stock shortages in retail trade have consistently held that it is impossible to claim that an inventory shortage establishes an actual loss of goods or merchandise or that the shortage, if actual, was due to dishonesty of employees. As a result, the language contained in the present bond was adopted by fidelity insurers."
However, prior to the general adoption of the type of exclusion clause here involved (hereinafter denominated the "inventory-exclusion clause") resort was had by the insurers to an apparently less restrictive clause but one nevertheless designed to block easy recovery on the basis of inventory computations. We set it out as a footnote and denominate it hereinafter as the "conclusive-proof" clause.[3]
*492 In Reese Cadillac Corp. v. Glens Falls Insur. Co., 59 N.J. Super. 118 (App. Div. 1960), we had occasion to construe a bond with a conclusive-proof clause. We there expressed the view, as one ground of decision, that literal application of the requirement of conclusive proof of employee dishonesty as the source of an inventory shortage would, to use the language of a federal decision, render the insurance of inventory shortages "practically valueless" (at p. 129). We consequently held that proof by a preponderance of the probabilities would suffice (at p. 130). In so doing we applied the well-established principle that in construing an insurance policy it is presumably the intention of the parties that in the event of loss the insured will be protected to the full extent that any fair interpretation of the contract will allow. Danek v. Hommer, 28 N.J. Super. 68, 76 (App. Div. 1953), affirmed o.b. 15 N.J. 573 (1954).
The conclusive-proof clause has been fairly consistently construed elsewhere as we did in Reese: Savannah Wholesale Co. v. Continental Casualty Co., 279 F.2d 706 (5 Cir. 1960); Morrow Retail Stores v. Hartford Accident & Ind. Co., 111 F. Supp. 772 (N.D. Idaho 1953); Standard Brass & Mfg. Co. v. Maryland Casualty Co., 153 So.2d 475 (La. Ct. App. 1963); cf. Leader Clothing Co. v. Fidelity & Casualty Co. of N.Y., 237 F.2d 7 (10 Cir. 1956). Moreover, in such cases the inventory records have been given such probative weight as they *493 inherently deserved with respect to the factor of employee infidelity in the loss as well as in respect of the amount of loss. See, particularly, the Morrow Retail Stores case, supra, where the accounting proof on inventory loss was strong.
Most of the cases which have hitherto had to deal with the inventory-exclusion clause here involved have not applied it literally, but in varying degrees have permitted resort to inventory records for proof of the amount of loss where the fact of employee-connected loss was inferable from proof, direct or circumstantial, independent of inventory records. Tri-Motors Sales, Inc. v. Traveler's Indemnity Co., 19 Wis.2d 99, 119 N.W.2d 327 (Sup. Ct. 1963); Kentuckiana Sales v. Security Ins. Co. of New Haven, 394 S.W.2d 744 (Ky. Ct. App. 1965); Fort Smith Tobacco & Candy Co. v. American Guar. & L. Ins. Co., 208 F. Supp. 244 (W.D. Ark. 1962); Sun Insurance Company of N.Y. v. Cullum's Men Shop, Inc., 331 F.2d 988 (5 Cir. 1964).
In an opinion somewhat lacking in analysis the inventory-exclusion clause was found to be clear and unambiguous and to require literal application to preclude recovery where the only proof of the amount of loss was by inventory computation. Mid-Continent Stores v. Central Surety & Ins. Corp., 377 S.W.2d 567, supra. See also Cy Anschutz and Associates v. Conley, 74 N.M. 363, 393 P.2d 710 (Sup. Ct. 1964), where a bond with such a clause was deemed not to be deficient in coverage but merely subject to fixed "standards for proof of losses" (for purposes of an action against a broker for delivery of an inadequate policy).
Flexible and varied approaches have been taken to the inventory-exclusion clause by those courts which have not deemed it an insuperable bar to use of inventory computations as a basis for recovery.
In Tri-Motors Sales, Inc. v. Traveler's Indemnity Co., supra, the court deemed the clause ambiguous. Applying the rule of resolving ambiguities against the insurer, it construed the language to mean that if under that portion of the clause following the semicolon the insured could prove by independent *494 evidence that some articles had been stolen by an employee, there would then be a "loss" established "through evidence wholly apart from" inventory computations, and the entirety of the clause before the semicolon would become inoperative, thereby rendering inventory computations competent to establish the amount of all losses. Nevertheless, the court refused recovery for more than the somewhat minor amount of thefts by a certain employee specifically proven, mainly because the substantial amount of inventory shortages spanned a period of time substantially greater than that of the suspect's employment.
Insofar as concerns the actual intent of the draftsman of the clause, we think the Tri-Motors Sales opinion constitutes an unwarranted straining of the meaning. Read as a matter of plain English, the clause precludes use of inventory computations at all in establishing a claim under the bond. The clause after the semicolon merely states, in permissive terms, the converse of the prohibition in the clause preceding the semicolon. If the general result achieved by the Tri-Motors Sales rationale is to be upheld, it must be, we think, upon principles of vindication of the fair expectations of purchasers of such insurance. See infra.
In Kentuckiana Sales v. Security Ins. Co. of New Haven, supra, the court arrived at substantially the same end-result as Tri-Motors Sales as to the effect of the inventory-exclusion clause, but upon a different rationale. It accepted the argument of the insured that the exclusion is to be operative only if the proof of loss is "dependent" upon the inventory computation, meaning "without other evidence"; that it did not prohibit the insured from "supplementing the proof and corroborating it by the use of" inventory computations (394 S.W.2d, at p. 748). The case involved loss of trading stamps and redemption merchandise in a redemption center. As to the merchandise, the court held there was an absence of "other" evidence, notwithstanding certain merchandise articles were found secreted in the premises and an employee was charged with and convicted for theft of the merchandise as *495 well as stamps and gave a statement of guilt to plaintiff (which he repudiated at the trial of the reported case). The conviction and admissions were held not evidential as to defendant. The court held, as to the stolen stamps, that there was competent evidence "unrelated to inventory computation" to show the employee had stolen them (at p. 749).
We have difficulty in accepting the Kentuckiana Sales construction of the inventory-exclusion clause as a matter of the actual intent of the draftsman. The entire clause should be read as an integrated unit. The word "dependent," before the semicolon, can hardly be read as meaning "solely dependent" in view of the language, "through evidence wholly apart from such computations," (emphasis added) after the semicolon.
In Fort Smith Tobacco & Candy Co. v. American Guar. & L. Ins. Co., supra, although the court purported to give the clause the literal reading which would preclude recovery unless the claimant could produce "evidence wholly apart from [inventory] computations" (emphasis added) which reasonably proved a loss due to the fraud or dishonesty of employees (208 F. Supp., at p. 258), it allowed recovery for the amount of cigarettes shown to be missing by an inventory audit where the employee in charge had embezzled cash (which he later replaced) and had tampered with cigarette inventory records, on the apparently inconsistent reasoning that the cigarette loss "is not entirely dependent upon an inventory computation" (at p. 265). Plaintiff was held not entitled to recover for inventory losses as to items other than cigarettes, even though the same employee was in charge, on the ground there was only a speculative basis to connect the employee with them.
In Sun Insurance Company of N.Y. v. Cullum's Men Shop, Inc., supra, a claim was made by a retail clothing store. Thirteen suits had been stolen and then recovered by police under circumstances permitting the inference that employees had collaborated with the thieves. A unit-type inventory record showed that garments having a wholesale value of $12,126.75 were missing. The defendant argued, inter alia, that *496 "proof of the existence of the loss and its amount was dependent solely upon an inventory computation." The court rejected the contention. It pointed out that as to the fact of the loss, there was the evidence concerning the 13 suits which were recovered. As to the amount of the loss, the jury had properly been permitted by the trial court to find that plaintiff's record was not an inventory computation but rather an "enumeration," which did not fall within the policy exclusion. As to the justification for the distinction here drawn between unit-type (perpetual inventory) records, deemed not within the exclusion clause, and inventory accounting involving estimates, we venture no opinion, the point not having been argued before us. It is obvious, however, that in relation to the narrow question of existence of actual loss (apart from cause of loss), unit-type records, if honestly and accurately maintained, are of higher probative value because not dependent upon assumptions or estimates of possibly debatable validity. Bunge, op. cit., Insurance Counsel Journal, October 1953, at pp. 272, 273.
Plaintiffs contend that if the inventory-exclusion clause is to be read as literally as the trial court read it in this case, it should be stricken as against public policy. The argument is that, characteristically, a condition of extensive thievery by employees is seldom exposed to the extent of the total losses involved by proofs independent of company records, and that therefore a policy exclusion of such inventory records as the insured possesses to establish the extent of loss where the fact of employee-connected loss is disclosed by direct or circumstantial proof thereof would render the insurance practically valueless. This position was expressly sustained in Standard Brass & Mfg. Co. v. Maryland Casualty Co., supra, where the court said (in a case involving a conclusive-proof clause):
"Were the assured to be denied the right to prove the loss from its books, records and documents, such policies as plaintiff holds would be of little or no benefit as no adequate protection would be afforded." (153 So.2d, at p. 482)
*497 Compare our own approach in refusing to give literal effect to the language of the conclusive-proof clause in Reese Cadillac Corp. v. Glens Falls Insur. Co., supra (59 N.J. Super., at p. 129).
There is a long history in this country of judicial striking down of "stipulations in insurance policies, which, though couched in terms of prerequisites of proof to establish entitling conditions or events, and frequently invalidated on purported principles of preclusion of ousting the court of jurisdiction or tampering with the rules of evidence, are seen to rest more fundamentally on concepts of public policy hostile to harsh or unfair restrictions against recovery on such policies." Garden State Plaza Corp. v. S.S. Kresge Co., 78 N.J. Super. 485, 501 (App. Div. 1963), certification denied 40 N.J. 226 (1963), citing cases, e.g., American Ben. Life Ass'n v. Hall, 96 Ind. App. 498, 185 N.E. 344 (App. Ct. 1933), invalidating a stipulation that "total disability" could be evidenced only by proof of actual confinement in a dwelling or hospital for at least two weeks and the necessary attendance of a doctor at least every three days.
A cogent exemplification of the approach of the courts in dealing with unfair insurance restrictions is found in Kievit v. Loyal Protective Life Ins. Co., 34 N.J. 475 (1961), which involved an action to recover under an accident insurance policy which indemnified "against loss resulting directly and independently of all other causes from accidental bodily injury." There was also an exclusion for "disability or other loss resulting from or contributed to by any disease or ailment." Plaintiff insured was accidentally struck above the eye by a board. He developed tremors and subsequently became totally disabled. Plaintiff's medical witness stated that he had had no pre-existing disease and that the tremors were likely an hysterical illness resulting from personality deficiencies. Defendant's medical proof indicated that plaintiff had quiescent Parkinson's disease pre-existing the accident which became aggravated thereby. The trial court accepted defendant's evidence and concluded against recovery because *498 the disability was not independent of the pre-existing condition. The Appellate Division affirmed.
In reversing and remanding for entry of judgment for the plaintiff, the Supreme Court began its substantive analysis as follows (at p. 482):
"When members of the public purchase policies of insurance they are entitled to the broad measure of protection necessary to fulfill their reasonable expectations. They should not be subjected to technical encumbrances or to hidden pitfalls and their policies should be construed liberally in their favor to the end that coverage is afforded `to the full extent that any fair interpretation will allow.'"
It went on to state that "[w]here particular provisions, if read literally, would largely nullify the insurance, they will be severely restricted so as to enable fair fulfillment of the stated policy objective." In dealing with a latent disease under this policy the court sought a "justly realistic approach," by taking the term disease in its common lay sense as connoting an active condition with visible symptoms. The court held plaintiff entitled to recover, whether he had a pre-existing psychic disorder or Parkinson's disease. Paying particular attention to the circumstances in which the policy was issued, the court pointed out that a literal reading was inappropriate because the policy was in force until age 65, by which time infirmities of age would almost inevitably arise, making recovery for any accident nearly impossible (at p. 489).
See also Mahon v. American Cas. Co. of Reading, 65 N.J. Super. 148, 166 (App. Div. 1961), certification denied 34 N.J. 472 (1961), and also the Kievit opinion, supra (34 N.J., at p. 483), approving the expression in Richards, Law of Insurance (4th ed. 1932), § 393, p. 704, that where a literal provision of the policy is "unreasonable and repugnant to the main purpose of the contract" it will be construed "very strictly against the insurers * * *."
We are satisfied, for the reasons already stated, that giving the inventory-exclusion clause its literal meaning in this case would be to nullify to a considerable extent the *499 benefits fairly contemplated by the insured when it purchased the policy. On the other hand, we cannot say that insurers do not have a legitimate concern in attempting to protect themselves against claims which are built upon self-created inventory records. Such records, generally honestly and accurately kept by businessmen, are sometimes not deserving of the full measure of that description, and even if they are, will generally be inexact reflections of actual inventory shortages if computed on the basis of assumed average mark-ups or profit margins (see discussion supra). The reluctance of insurers to accept inventory or profit and loss computations as proof of the fact or amount of losses alleged to result from dishonesty of employees is therefore understandable. See Kurland, op. cit., passim. The judicial problem, therefore, is one of fair accommodation of the general right of an insurer to fix his undertaking, cf. Linden Motor Freight Co. Inc. v. Travelers Ins. Co., 40 N.J. 511, 525 (1963), and that of the general public, in buying insurance containing frozen, unbargained-for policy limitations, to get the degree of coverage it reasonably envisages.
Such accommodation, in our judgment, should preclude recovery by the insureds under this bond if they had no proof whatever of an employee-connected loss other than inventory or profit and loss computations, no matter how reliable in the particular case. On the other hand, inventory records may by their very nature constitute inherently indispensable proof of an allowable claim under a fidelity bond in one or the other or both of two respects: (a) as the only available proof of the full amount of a loss, there being some appreciable proof from other facts or circumstances of a loss caused by employee-dishonesty; (b) as corroboration sufficient to make a case for the fact-finder of the fact of an employee-connected loss where independent proof thereof, considered alone, might be insubstantial. To deny an insured the right to adduce proof of inventory records for either of these purposes might in a particular case defeat justice by precluding recovery on a meritorious claim by use of the only *500 proofs reasonably available to the insured and probative thereof. So to do would contravene public policy, not only in defeating the reasonable expectations of coverage of the purchaser of the insurance but also in allowing a private agreement to nullify the inherently probative effect of relevant evidence. Cf. Garden State Plaza Corp. v. S.S. Kresge Co., supra (78 N.J. Super., at pp. 500-503).
It goes without saying that the variety of combinations of facts and circumstances possible in cases of this type is endless, and it is impossible to formulate any special rule by which to measure the degree of probative force necessary in a particular case to withstand a motion for dismissal for insufficiency of evidence. The out-of-state cases discussed above involving inventory-exclusion clauses are suggestive of the potential range of situations permitting recovery although partly dependent upon proof through inventory records.
In reversing and remanding in this case, we mean to imply no prediction as to whether plaintiff's proofs at trial will suffice to withstand a motion for dismissal for insufficiency as a matter of law. We here merely decide, for reasons already stated, that we cannot on this record affirm the judgment for defendant, whether considered on the basis of the motion on the stipulation or the prior motion for summary judgment.
Reversed and remanded for further proceedings consistent with this opinion.
NOTES
[1] In this regard, however, note section 4 of the conditions of the bond which provides:

"SECTION 4. If a loss is alleged to have been caused by the fraud or dishonesty of any one or more of the Employees and the Insured shall be unable to designate the specific Employee or Employees causing such loss, the Insured shall nevertheless have the benefit of this Bond, subject to the provisions of Section 2 of this Bond, provided that the evidence submitted reasonably proves that the loss was in fact due to the fraud or dishonesty of one or more of the said Employees, and provided, further, that the aggregate liability of the Underwriter for any such loss shall not exceed the amount stated in Item 3 of the Declarations."
[2] One common inventory practice is by stock records of goods on hand maintained on the basis of aggregate dollar value. Calculations from sales records taking into account average profit or mark-up are used to determine cost of goods sold and the dollar value of inventory which should be on hand. There is always the likelihood of some degree of estimation error in any such system. See Kurland, op. cit., p. 397. However, perpetual inventory or "unit basis" accounting, if honestly and accurately maintained, is free of that variable, since it is based on actual counting of specific items on hand and identification of such items when sold. Ibid. There is, of course, also the possibility of dishonest accounting of inventory for one purpose or another.
[3] DISHONESTY COVERAGE  FORM B
1. Through any fraudulent or dishonest act or acts committed anywhere by any of the Employees acting alone or in collusion with others, including loss of Money and Securities and other property through any such act or acts of the Employees, and including that part of any inventory shortage which the Assured shall conclusively prove to have been caused by the fraud or dishonesty of any of the Employees, the amount of insurance on each of such Employees being the Limit of Liability applicable to this Insuring Agreement 1.
Loss Caused by Unidentifiable Employees
If a loss is allaged to have been caused by the fraud or dishonesty of any one or more of the Employees and the Assured shall be unable to designate the specific Employee or Employees causing such loss, the Assured shall nevertheless have the benefit of this Insuring Agreement 1, provided that the evidence submitted reasonably (in case of inventory shortage, conclusively) establishes that the loss was in fact due to the fraud or dishonesty of one or more of the said Employees, and provided further that the aggregate liability of the Company for any such loss shall not exceed the Limit of Liability applicable to this Insuring Agreement 1."